ALTSHULER BERZON LLP
JAMES M. FINBERG (114850)
jfinberg@altber.com
EVE H. CERVANTEZ (164709)
ecervantez@altber.com
177 Post Street Suite 200
San Francisco, CA  94108
Telephone:  (415) 421-7151
Facsimile: (415) 362-8064


BARRACK, RODOS & BACINE
STEPHEN R. BASSER (121590)
sbasser@barrack.com
SAMUEL M. WARD (216562)
sward@barrack.com
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:     (619) 230-0800
Facsimile:     (619) 230-1874

Attorneys for Plaintiff Duane Fosdick

(Additional Counsel for Plaintiff Appear on Signature Page)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DUANE FOSDICK, on behalf of himself and all others similarly situated | Case No.: |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | DEMAND FOR JURY TRIAL |
| WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A., D/B/A WELLS FARGO DEALER SERVICES, and NATIONAL GENERAL INSURANCE COMPANY | |
| Defendants. | |

Plaintiff Duane Fosdick, on behalf of himself and all others similarly situated, files this Class Action Complaint (the "Complaint") against defendants Wells Fargo & Company, Wells Fargo Bank, N.A., (collectively "Wells Fargo") and National General Insurance Company (collectively "Defendants").  Plaintiff, by and through his counsel, alleges as follows based on information and belief and the investigation of counsel:

## I.    INTRODUCTION

1.    On July 27, 2017, the *New York Times* published an article disclosing a wide ranging and long time fraud perpetrated by Wells Fargo and National General Insurance Company ("National General Insurance") against consumers who financed their automobile loans through Wells Fargo.  The scheme perpetrated by Wells Fargo and National General Insurance has resulted in the wrongful imposition of force-placed collateral protection insurance policies ("CPI policies") on approximately 800,000 Wells Fargo automobile loan customers between 2012 and 2016.

2.    CPI policies are designed to protect a lender's interest in an automobile.  While, pursuant to the terms of automobile loans, consumers are commonly required to purchase automobile insurance sufficient to protect the lender's interest, very few lenders require that CPI policies be imposed upon consumers if the lender determines that the consumer has failed to purchase or maintain automobile insurance.  This involuntary imposition of insurance policies is commonly referred to as "force-placed" insurance.

3.    Under an agreement between Wells Fargo and National General Insurance, Wells Fargo would provide information regarding its automobile loan customers to National General Insurance.  National General Insurance was supposed to determine whether these automobile loan customers had adequate insurance and inform Wells Fargo of the lack of adequate insurance or the lapse of insurance policies.  But National General Insurance and Wells Fargo did not take adequate steps to determine whether automobile loan customers had adequate automobile insurance, or even listen to consumers who told them, and documented, that they had adequate insurance.  Instead, National General Insurance issued CPI policies that were

force-placed by Wells Fargo on automobile loan customers who already had adequate insurance. These force-placed CPI policies were often much more expensive than policies that consumers had or could obtain on their own.

4.    For many Wells Fargo automobile customers, the imposition of CPI policies resulted in substantially higher automobile loan payments to pay for the unneeded and unwanted insurance premiums and interest thereon. Faced with these higher payments, thousands of customers suffered late fees, overdraft fees, delinquency charges, and, in many cases, ultimately saw their vehicles wrongfully repossessed by Wells Fargo, all of which also led to damaged credit scores.

5.    Within hours of the publication of the *New York Times* article, Wells Fargo issued a public statement acknowledging the long-running fraud and admitting that hundreds of thousands of customers were harmed by wrongfully force-placed CPI policies. Although Wells Fargo has issued public statements promising to repay its customers for some (but not all) of the losses they have suffered, consumers cannot count on these empty promises issued years after Wells Fargo knew of the problem.

6.    As set forth in detail below, Plaintiff suffered damages arising from a wrongfully force-placed CPI policy that was imposed by Wells Fargo in 2014. Plaintiff brings this action on behalf of a class (the "Class"), consisting of all Wells Fargo automobile loan customers who, as a result of Defendants' unlawful scheme, were charged premiums for wrongfully force-placed CPI policies as well as interest, fees, and other costs associated with the CPI policies.

## II.    PARTIES

7.    Plaintiff Duane Fosdick is a resident of Paradise, California. In July 2013, Mr. Fosdick purchased a 2013 BWM 335i at Courtesy Automotive in Chico, California. Mr. Fosdick financed the purchase with an automobile loan through Wells Fargo.

8.    Mr. Fosdick was insured through National General Insurance at the time he purchased the BMW 335i and continuously maintained his insurance thereafter. Despite maintaining insurance through National General Insurance, sometime after his purchase in

2013, Wells Fargo caused the force-placement of a CPI policy in relation to his automobile loan. In 2014 and 2015, Wells Fargo debited Mr. Fosdick's bank account for insurance premiums relating to the force-placed CPI policy.

9.     Mr. Fosdick ultimately paid approximately $2,300 in premiums, interest, and other fees and costs arising from the force-placed CPI policy, despite the fact that he already had, and maintained throughout the term of the loan, adequate insurance on his car.

10.     Wells Fargo & Company is incorporated in Delaware and maintains its headquarters in San Francisco, California.

11.     Wells Fargo Bank, N.A., is a subsidiary of Wells Fargo & Company.  Wells Fargo Bank, N.A. is a national association bank chartered in South Dakota with its principal place of business in San Francisco, California.  The members of the Board of Directors of Wells Fargo Bank are also directors of Wells Fargo & Company.

12.     Wells Fargo Dealer Services is a division of Wells Fargo Bank, N.A. and was responsible for providing the automobile loans at issue here.  Wells Fargo Bank, N.A. is the direct owner of all of the loans at issue in this litigation and Wells Fargo Bank, N.A. is the primary entity used by Wells Fargo to originate and service automobile loans.

13.     Plaintiff is informed and believes and, based thereon, alleges that Wells Fargo & Company and Wells Fargo Bank, N.A., did, at all times material, serve as agents of each other and acted within the scope of that agency and with the express or implied knowledge of the other in ratifying and approving the acts of the other.

14.     Wells Fargo & Company exercises control over the operations of Wells Fargo Bank, N.A., and exercised control over Wells Fargo Bank, N.A. in relation to the specific activities at issue in this action.

15.     National General Insurance Company is incorporated in Missouri and maintains its headquarters in Winston-Salem, North Carolina.  National General Insurance provided both insurance tracking services and CPI policies to Wells Fargo Bank for automobile loans originated by Wells Fargo Bank, N.A.

**III.    JURISDICTION AND VENUE**

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331 because this action arises under federal law, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO").

17.    Pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), this Court also has original diversity jurisdiction over this action because it is brought as a class action on behalf of hundreds of thousands of class members, one or more members of the Class are citizens of a different state than each of the Defendants, and the aggregate claims of the Class Members exceed $5 million, exclusive of interest and costs.

18.    The Court has personal jurisdiction over Defendants because Wells Fargo's principal place of business and headquarters are in San Francisco, California; National General Insurance sells insurance in California, including in San Francisco; and Defendants regularly transact business in California, and thus have minimum contacts in California, and in this District.

19.    Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants regularly conduct business in this district and a substantial part of the events giving rise to the claims alleged in this action occurred in this District.

**IV.    INTRADISTRICT ASSIGNMENT**

20.    Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-2(d), assignment to the San Francisco or Oakland division is appropriate because a substantial part of the events which give rise to the claims occurred at Wells Fargo headquarters in San Francisco.

**V.    FACTUAL ALLEGATIONS**

21.    On July 27, 2017, the *New York Times* published a news article titled "Wells Fargo Forced Unwanted Auto Insurance on Borrowers."  In the article, the *New York Times* asserted that since at least 2012, and possibly as early as 2006, Wells Fargo Bank had been

improperly charging hundreds of thousands of auto loan customers for CPI policies that the customers did not need because they already had auto insurance in place.  According to the *New York Times* article, since at least 2012 and until September 2016, the CPI policies imposed by Wells Fargo were underwritten by National General Insurance.  When automobile purchasers financed automobile loans through Wells Fargo, information on the customers was forwarded by Wells Fargo to National General Insurance.  Using a database, National General Insurance was supposed to determine whether the customers had insurance coverage for the vehicle.  If the customer did not have automobile insurance or failed to maintain insurance, National General Insurance could then add a CPI policy, which would then be billed to the customer by Wells Fargo following notice to the customer.  However, in many cases, National General Insurance issued CPI policies, and Wells Fargo charged consumers for those CPI policies (often without prior notification), even when the customer already had automobile insurance.

22.    These mandatory CPI policies, often referred to as "force-placed" policies, are unusual in the automobile loan industry because most states already require that automobile owners maintain insurance and most automobile loan agreements similarly require that the purchaser maintain suitable automobile insurance.

23.    The same day that the *New York Times* article was published, Wells Fargo issued a press release acknowledging the fraud, but attempting to downplay both its role in the fraud and the extent of its culpability.  The Wells Fargo Press Release announced that Wells Fargo intended to compensate approximately 570,000 of its customers who were wrongfully charged for CPI policies.  In the press release, Wells Fargo acknowledged that a review undertaken more than a year prior had determined that almost half a million consumers who had purchased automobile loans financed by Wells Fargo had had CPI policies wrongly placed even though these consumers were already adequately insured.  Wells Fargo claimed that it had already refunded the premiums and interest for the duplicative coverage when customers made it aware of their other coverage, and stated that it would pay an additional $25 million to these customers as a refund for fees and interest.   In addition, Wells Fargo admitted that an additional 60,000 consumers had not received legally required notices regarding the CPI policies and

approximately 20,000 consumers had had their cars repossessed in instances where wrongfully imposed CPI policies contributed to loan defaults.   Wells Fargo asserted that it would pay approximately $80 million altogether to consumers harmed by its wrongful imposition of CPI policies, but provided no specifics as to how it would compensate consumers.  Wells Fargo also admitted that customers' credit reports may have been damaged by its actions, but did not promise to make any payment for these damaged credit reports that cost customers hundreds or thousands of dollars in higher interest rates and/or denied loans.

24.    Wells Fargo attempted to insulate itself, blaming the fraudulent CPI policy placement on "external vendor processes" and "inadequate" internal controls.   In addition, Wells Fargo claimed that it had "initiated a review of the CPI Program" in July 2016 in response to "customer concerns" prior to halting the force-placed CPI program in September 2016 (though it offered no excuse for failing to notify the public or even contemplating a reimbursement program until its fraudulent scheme was publicized in the July 2017 *New York Times* article).  Moreover, there is evidence that Wells Fargo knew of the wrongful imposition of CPI policies well before July 2016.  Indeed, as reported in the *New York Times* article, numerous complaints regarding the force-placement of CPI policies by Wells Fargo had been filed against Wells Fargo with the Consumer Financial Protection Bureau in recent years. Despite this, Wells Fargo failed to review the systematic force-placement of CPI policies until July 2016 and then waited for another year – July 2017, to disclose to customers and the public the years-long scheme.  Wells Fargo's admission came only on the heels of the *New York Times*' revelation of its practices.

25.    While, in theory, consumers should have been able to contact Wells Fargo and have the charges related to these wrongfully force-placed CPI policies reversed, Wells Fargo put numerous roadblocks in front of its own customers.  When consumers attempted to address the wrongful imposition of CPI policies, they were met with dead end after dead end.  One

Wells Fargo automobile loan customer whose car was repossessed for failure to pay premiums on a wrongfully imposed CPI policy recounted his experience to National Public Radio:[1]

> "I showed up at that bank with my bank statements showing all the payments I made for my vehicle and my proof of insurance showing that I've never had a lapse in my insurance," he says. "The people at the bank were like, 'Well, you shouldn't owe anything because it's not your fault.' They were just as confused as I was."
>
> *    *    *
>
> [The branch employees] called up the Wells Fargo department for him that deals with car repossessions to find out what was going on. They kept getting put on hold.
>
> "We were probably on hold for a total of 2 1/2 hours while I was in there," Feifer says. "I literally spent the whole day" at the branch.
>
> *    *    *
>
> Feifer was eventually told to call back several days later. Then he was told there was no record of his prior calls from the branch. He said the person he spoke to on the phone wouldn't let him talk to a supervisor. "She was rude to me, talking over me, I felt like she wasn't willing to hear anything I had to say," Feifer says. He says the Wells Fargo representative just kept telling him he had to pay the money.
>
> Meanwhile, Feifer was told that the clock was ticking and his car would be auctioned off two weeks from the day it was repossessed. So, after much haggling with the bank, he paid about $600 to get his car back.
> Feifer said he figured this was just some freak mistake. But when he heard this insurance issue affected hundreds of thousands of customers, "I was blown away," he says. "I wasn't alone in it and I felt like they're preying on everybody, taking people's money. I felt like they're crooks."

26.     Consumers who knew that they already had adequate automobile insurance in place were forced to pay for the wrongfully force-placed CPI policies. Absent doing so, they faced late fees, delinquency charges, repossession, and harm to their credit rating. Indeed, as set forth below, Wells Fargo acknowledges that approximately 20,000 customers had their automobiles repossessed following the wrongful force-placement of CPI policies.

27.     In addition, Defendants often failed to provide legally required notices to consumers of the imposition of CPI policies. In its July 27, 2017 press release, Wells Fargo

---

[1]     Chris Arnold, *Who Snatched My Car? Wells Fargo did,* NPR, Aug. 2, 2017, http://www.npr.org/2017/08/02/541182948/who-snatched-my-car-wells-fargo-did, last visited on August 24, 2017.

acknowledged these failures, admitting that approximately 60,000 customers had not received legally required notices of the forced-placement of CPI policies. However, according to a report prepared for Wells Fargo by consulting firm Oliver Wyman (the "Wyman Report"), Wells Fargo failed to provide legally required notice to approximately 100,000 customers in Arkansas, Michigan, Mississippi, Tennessee, and Washington.

28.    Even in instances where Defendants provided some form of notice of the forced-placement of CPI policies, many consumers would have been unaware of the issue because Wells Fargo automatically deducted payments for automobile loans from the accounts of its customers. Thus, many consumers were unaware of the additional cost until after the fact.

29.    Because of the way Wells Fargo structures loan repayments, the imposition of the CPI policies increased the amount of loan interest paid by consumers. Wells Fargo specifies that payments on auto loans will be credited first to interest owed on the car, then to lender-placed insurance, and only then would payments be applied to the loan principal. As a result, because consumers' payments were used to pay for the wrongfully-placed CPI rather than to pay down their loan balance, they also incurred additional interest payments on their car loans because the principle owing did not decrease as rapidly as it should have.

30.    The revelation of the long-running CPI policy fraud followed less than a year after Wells Fargo reached a settlement with the United States Department of Justice over the illegal repossession of automobiles owned by active duty servicemembers. On September 29, 2016, the Department of Justice announced the settlement, which addressed hundreds of repossessions undertaken by Wells Fargo between January 1, 2008 and July 1, 2015. In each instance, Wells Fargo repossessed the automobiles of active duty servicemembers without first seeking court review as required by law. This settlement followed a lengthy investigation by the Department of Justice as well as an internal review at Wells Fargo that began no later than mid-2014. Despite this long-running investigation regarding auto loans made to active duty servicemembers, and despite the existence of numerous complaints filed with the CFPB, Wells Fargo failed to even begin to address its force-placed CPI policies, practices, and procedures until July 2016, and has yet to take any concrete steps to make consumers whole.

31.     Indeed, complaints lodged as early as 2015 on the Consumer Financial Protection Bureau website raise issues regarding wrongfully force-placed CPI policies:

April 9, 2015:

I am a single mother of XXXX who has been a loyal Wells Fargo customer for over 15 years. My loyalty stems from the fact that my family and I have XXXX accounts with Wells Fargo which is why I decided to use the Wells Fargo Dealer Services car loan service rather the other options that I had when I purchased my car in XX/XX/XXXX. I could never have imagined that a company I supported this much would be the one to destroy my credit worthiness by reporting me late and by closing my account when I have made all my payments to date. I have requested for the pay off amount, the transcripts of all my calls to WDLS and have yet to receive these documents. Here is brief about this case below : XXXX XXXX, Collections Manager is charging me for insurance when I already carry insurance through XXXX. This is a scam to steal funds from me! I traveled out of the area on business for months and garaged me car. I arranged with my XXXX insurance to remove collision insurance from the comprehensive insurance since I would not be driving the car. However all the other insurance was intact and I paid all my premiums. XXXX XXXX requested proof and I submitted all documents ; held XXXX way telephone conversation with XXXX XXXX, my insurance agent who explained that the car is covered, Wellsfargo insurance agent who stated that it was up to XXXX XXXX to waive the Wellsfargo insurance for me as has been done for other people. XXXX XXXX told me that the waiver has been done. So I was surprised when my credit bureau report shows that I was reported late for late payment even though I had been paying my usual payment without including the Wellsfargo added insurance since XXXX XXXX said it was taken care off. When I called XXXX XXXX, he apologized profusely and said he would take care of this, and have my credit profile corrected but he was just stalling. He asked me to call the insurance dept of Wellsfargo who told me that they do n't know why XXXX XXXX asked me to call them because they do not have anything to do with waivers. XXXX XXXX has been lying to me and is using the credit bureau report as an intimidating way to get me to pay Wellsfargo Dealer Services another over 600 dollars which XXXX XXXX will get credit for, which is a XXXX charge because I already have insurance with XXXX which even with the collision coverage included is cheaper than what Wellsfargo Dealer Services insurance is charging me. I have tried to resolve this through Wells Fargo Dealer Services but all they do is threaten me. This is a scam and should be STOPPED! Even their own insurance department has said that it is a scam! I have tried to resolve this case through Wells Fargo Dealer Services, WDLS, Customer Service and various channels for the past year without success. I reached out to Better Business Bureau, but WDLS keeps using delay tactics to draw out the complaint's duration and the case has not been resolved. A staff member at Wells Fargo Bank branch recommended that I reach out to the CEO for assistance after hearing my story of how Wells Fargo Dealer Services is charging insurance for my garaged car which already has insurance and for which I have filed a Certificate of Non-Use. I did so on XX/XX/XXXX and have not received a response. In the mean time my credit worthiness is under attack and my FICO score has dipped negatively. The

incorrect credit report needs to be corrected ; the late fees need to be removed; and the harassing phone calls need to be stopped- XXXX XXXX continues to

call me and that needs to stop! I have attached supporting documents that will enlighten you more about this unfortunate situation. I look forward to your intervention and a speedy reversal of these actions by WDLS.

April 7, 2015:

I moved from XXXX to XXXX switched my insurance and notified Wells Fargo of the new insurance information. Well Fargo neglected to update my current insurance information. Wells Fargo charged my loan for an insurance policy without contacting me. Once I realized what they did I contacted them and was told everything would be reversed. That was 4 months ago. They continue to hit me with late fees and finance charges. I even have a recorded conversation from XXXX/XXXX/XX/XX/2015 where she says she will reverse and nothing was done according to my XXXX statement

December 22, 2015:

I will like to file a CFPB Complaint against Wells Fargo Dealer Service for inaccurate billing practices while deployed. On XXXX XXXX, I opened a car loan with WFDS. On XXXX XXXX, I deployed for 12 months. During this deployment, my loan was not deducted to 6 % as required under the SCRA ( Reduction of Interest to 6 % ) XXXX. The bank was notified and completely aware of this deployment but failed to decrease the interest. Also, during this time my vehicle insurance was changed to liability due to it being stored on a military installation. The vehicle was insured and covered by law. During this time, WFDS implemented their own insurance and charged me discreetly. This has caused my loan to fall into delinquency. Currently to date, the loan payment has always been promptly paid on time, never late. Thank you

32.     In each of these instances, the CFPB website indicates that Wells Fargo chose "not to provide a public response" to these allegations, further frustrating the ability of other consumers to discover that they too had been charged for wrongfully force-placed CPI policies.

33.     While Wells Fargo's admissions were staggering, as reported in the *New York Times* article, its acknowledgement that it had harmed 570,000 consumers fell short of estimates included in the Wyman Report. As reported by the *New York Times*, the Wyman Report concluded that, as a result of the improper imposition of CPI policies, at least 25,000 Wells Fargo customers had lost their automobiles to repossession and 274,000 consumers had been pushed into loan delinquency.  Moreover, the Wyman Report concluded than an eye-popping 800,000 consumers had been victimized by the fraud perpetrated by Wells Fargo and National General.

34.   The findings of the Wyman Report were limited to a period running from January 2012 through July 2016.  However, as reported in the *New York Times* article, Wells Fargo began requiring CPI policies as early as 2006 and continued force-placing CPI insurance in connection with National General Insurance until September 2016, making it likely that the Wyman Report failed to identify all of the consumers harmed by Defendants' practices.

35.   Because Wells Fargo disagrees with the findings of the Wyman Report, it is impossible to determine how many consumers have been harmed by the fraudulent scheme undertaken by Wells Fargo and National General Insurance.  Similarly, while Wells Fargo has indicated that it intends to reimburse harmed consumers, it has failed to explain how it is determining proper compensation, and it clearly does not intend to compensate all of the consumers identified in the Wyman Report.  Nor has Wells Fargo agreed to pay consumers for all of their damage, including lowered credit scores.  Thus, even if Wells Fargo were to actually make the payments to consumers that it announced in its July 2017 press release (and there is no guarantee it will), any such payments will not fully reimburse all of the affected consumers.

36.   At some point prior to 2012, National General Insurance and Wells Fargo entered into an agreement pursuant to which National General Insurance would serve as the CPI policy provider for automobile loans financed through Wells Fargo.  National General Insurance would determine whether Wells Fargo automobile loan customers were covered by adequate insurance and, if not, would issue CPI policies to protect Wells Fargo's interests in the vehicles that were the subject of the loans.

37.   Under the terms of the agreement between National General Insurance and Wells Fargo, Wells Fargo would pay National General Insurance for CPI policies issued by National General Insurance to Wells Fargo automobile loan customers.  National General Insurance would, in turn, pay a commission to Wells Fargo for said CPI policies.  The agreement by which Wells Fargo received commissions from National General Insurance allegedly ended in 2013.  However, Wells Fargo continued to benefit from wrongfully force-placed CPI policies through, *inter alia*, interest charged to consumers for CPI policies, late fees, delinquency

charges, reinstatement fees, and other fees and costs associated with the wrongful force-placement of CPI policies.

38.    National General Insurance benefitted through the issuance of hundreds of thousands of unnecessary, unwarranted, and unwanted force-placed CPI policies. To further the issuance of these CPI policies, National General Insurance instituted procedures, both formal and informal, that put roadblocks in front of consumers who sought to prove that they had adequate insurance.  National General Insurance also instituted procedures, both formal and informal, that made it less likely that National General Insurance would properly identify existing automobile insurance policies.  The end result of these procedures was the improper forced-placement of CPI policies and harm to consumers arising therefrom.

## VI.    CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons who obtained a vehicle loan through Wells Fargo Bank, N.A. or any of its subsidiaries or divisions, including Wells Fargo Dealer Services, and who were charged premiums and/or any related fees for collateral protection insurance placed by Defendants even though they had adequately insured the vehicle themselves.

40.    Excluded from the proposed Class are Defendants, their agents, officers, and directors, and their families, as well as their parent companies, subsidiaries and affiliates.  Also excluded are any judicial officer assigned to this case. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information.

41.    This action may be properly maintained as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

42.    ***Numerosity***:    The Class is so numerous that joinder of all members is impracticable.  Plaintiff believes that the Class number in the hundreds of thousands and that members of the Class reside throughout the United States.

43.    ***Commonality and Predominance***:  There are numerous questions of law and fact common to the members of the Class and these common questions predominate over any individualized issues. These common questions of law and fact include, but are not limited to:

a)    whether Defendants wrongfully force-placed CPI policies on Wells Fargo customers who already had adequate automobile insurance policies;

b)    whether Defendants wrongfully charged members of the Class for CPI policies;

c)    whether Defendants wrongfully charged fees and interest to members of the Class as a result of the wrongfully placed CPI policies;

d)    whether Defendants received commissions or other value arising from the wrongful placement of CPI policies on members of the Class;

e)    whether Defendants used the mail and wires to conduct a scheme to defraud Plaintiff and members of the Class by unlawfully placing CPI policies on member of the Class and demanding payment for said policies;

f)    whether Defendants misrepresented the nature and purpose underlying their force-placement of CPI policies;

g)    whether Defendants extorted money from members of the Class through the wrongful use of threats of economic harm and repossession of their vehicles;

h)    whether Defendants' purpose in wrongfully force-placing the CPI policies at issue was to generate unwarranted and unreasonable profits for Defendants at the expense of Plaintiff and the members of the Class;

i)    whether Defendants violated 18 U.S.C. § 1962(c);

j)    whether Defendants violated 18 U.S.C. § 1962(d);

k)    whether Defendants violated California Business and Professions Code § 17200, *et seq.;* and

l)    whether Plaintiff and members of the Class are entitled to actual damages, restitution, restitutionary disgorgement; statutory damages, treble damages, punitive damages, equitable relief, or declaratory relief.

44.    ***Typicality:***  Plaintiff's claims are typical of those of the other members of the Class.  As alleged in detail above, Plaintiff and members of the Class sustained damages arising from the same course of unlawful conduct by Defendants.

45.    ***Adequacy***:  Plaintiff is willing and able to represent the Class. Plaintiff understands the obligations and duties of a class representative.

46.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has no interests adverse to, or in conflict with, the interests of the members of the Class.  Plaintiff will represent and protect the interests of absent members of the Class.

47.    Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, including class actions such as this, and will adequately prosecute the action, asserting and protecting the rights of Plaintiff and the absent members of the Class.

48.    ***Superiority***:  A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each member of the Class, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if members of the Class themselves could afford such individualized litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

49.    Plaintiff and members of the Class did not know, and could not know the true nature and extent of Defendants' scheme to wrongfully force-place CPI policies, thus Plaintiff and the members of the Class were unable to prosecute their claims against Defendants.

50.     Defendants were under a continuous duty to disclose to Plaintiff and members of the Class the true nature, purpose, and genesis of the charges they assessed to the accounts of Wells Fargo customers.  Despite this duty, Defendants knowingly and actively concealed their fraudulent force-placement of CPI policies, and Plaintiff and members of the Class reasonably relied on that knowing and active concealment. Thus, Plaintiff and the members of the Class had no way of knowing the true character, quality, and nature of the charges that were assessed by Defendants.

51.     Indeed, Wells Fargo failed to make public disclosure regarding fraudulent force-placement of CPI policies until July 27, 2017, many years after Defendants established the enterprise and scheme by which they perpetrated their fraudulent acts, and an entire year after internal reports further explained the wrongdoing.  Defendants' failure to previously disclose the fraudulent force-placement of CPI policies is indicia of Defendants' intent to hide their scheme and their unlawful and wrongful behavior from Plaintiff, members of the Class, and regulators.

52.     Accordingly, any applicable statute of limitation has been tolled by operation of the discovery rule with respect to all claims alleged herein, and Defendants are estopped from relying on any statutes of limitation in defense of this action.

**VII.    CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")**

**(18 U.S.C. § 1962(c)-(d))**

53.     Plaintiff incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

54.     Plaintiff brings this Count on behalf of himself and the Class against Defendants.

55.     Defendants Wells Fargo & Company, Wells Fargo Bank, N.A., and National General Insurance are each "persons" within the meaning of 18 U.S.C. § 1961(3).

56.     Plaintiff and the members of the Class are each "persons" within the meaning of 18 U.S.C. § 1961(3) and each has been injured in their business or property as a result of Defendants' wrongful conduct and violation of 18 U.S.C. § 1962(c).  Specifically, Plaintiff and members of the Class lost money paid for CPI premiums for insurance they did not want or need, as well as increased interest, fees, and costs, including, for some, the cost of vehicle repossession and lowered credit scores and damages credit reports.

57.     Pursuant to 18 U.S.C. § 1962(c), it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

58.     Pursuant to 18 U.S.C. § 1962(d) it is unlawful for "any person to conspire to violate" 18 U.S.C. § 1962(c).

59.     As set forth in detail below, Defendants conspired to engage and engaged in the fraudulent placement of CPI policies in connection with automobile loans issued by Wells Fargo.  Defendants also conspired to engage, and engaged, in extortion, and obtained money in the form of premiums, interest, and other fees from Plaintiff and Class members through the wrongful use of actual and threatened economic harm and fear, including, but not limited to, threats to repossess vehicles as to which there was no lawful right of repossession.  Through the fraudulent placement of CPI policies and threatened economic harm to consumers who did not pay for those forced-place CPI policies, Defendants sought to, and did, wrongfully extract millions of dollars in premiums, interest, and associated fees and costs in violation of  18 U.S.C. § 1962(c).

A.     The CPI Enterprise

60.     At all time relevant, in violation of 18 U.S.C. § 1962(c), Defendants Wells Fargo & Company, Wells Fargo Bank, N.A., and National General Insurance formed and conducted the affairs of an association-in-fact enterprise.  This association-in-fact enterprise (the "CPI Enterprise"), an ongoing, continuing group or unit of persons and entities, was associated together for the common purpose of profiting from a course of conduct of unlawfully charging

Plaintiff and members of the Class for force placed CPI policies, placed in relation to automobile loans that were unauthorized, unrequested, unnecessary, and unlawful.

61.     The CPI Enterprise consists and is made up of each of the Defendants, Wells Fargo & Company, Wells Fargo Bank, N.A., and National General Insurance Company, and their respective directors, employees, and agents.

62.     The members of the CPI Enterprise created and engaged in a scheme to defraud Plaintiff and members of the Class through a series of fraudulent misrepresentations, omissions, and false pretenses (the "CPI Scheme").  As alleged herein, the purpose of those fraudulent misrepresentations, omissions, and false pretenses was to collect premiums, interest, costs and fees arising from the wrongful and fraudulent forced placement of CPI policies relating to automobile loans.

63.     In order to further the CPI Enterprise, Defendants each made material misstatements regarding, *inter alia*, (1) whether CPI policies were required for particular automobile loans; (2) whether automobile loan customers already maintained suitable automobile insurance; (3) the protocols used to determine whether a CPI policy was necessary for a particular automobile loan; and (4) the true cost of obtaining an automobile loan through Wells Fargo. Absent these misrepresentations and borrowers' reliance thereon, the CPI Enterprise could not have achieved its common purpose.

64.     In order to further the CPI Enterprise, Defendants wrongfully threatened consumers with economic harm, including repossession of their vehicles, if they failed to pay the improperly levied CPI premiums, as well as interest and other related fees.

65.     Each member of the CPI Enterprise has an existence separate and distinct from the enterprise.  The CPI Enterprise is linked through a series of contractual relationships, agreements, and financial ties and is maintained through coordinated activities carried out by Wells Fargo & Company, Wells Fargo Bank, N.A., and National General Insurance Company. In addition, the CPI Enterprise had an existence separate and distinct from that of each of its members and separate and apart from the pattern of racketeering engaged in by the Defendants.

66.     The members of the CPI Enterprise regularly communicated and exchanged information, via the wires and the mail, about customers and these communications and exchanges were used to further the goals of the CPI Enterprise.

67.     The goals of the CPI Enterprise could not have been achieved without the engagement and assistance of each member of the CPI Enterprise.

68.     The members of the CPI Enterprise each benefitted from their participation in the enterprise.  Specifically, as underwriter of the wrongfully force-placed CPI policies, National General Insurance profited in its receipt of premiums.  Wells Fargo & Company and Wells Fargo Bank, N.A., each profited through the receipt of fees and costs, as well as increased interest payments, relating to the force placed CPI policies.  In addition, until 2013, Wells Fargo & Company and Wells Fargo Bank, N.A. both profited from the receipt of commissions from National General Insurance for the sale of force placed CPI policies.

**B.      The Conduct Of The CPI Enterprise**

69.     Wells Fargo exerted control over, and participated in the operation and management of, the CPI Enterprise, both directly and indirectly, through the following acts:

(1)     misrepresenting the terms of the automobile loans to Plaintiff and members of the Class during the application process;

(2)     transmitting loan applications and other documentation relating to automobile loans to National General Insurance;

(3)     misrepresenting the role of National General Insurance in the loan application process;

(4)     causing to be issued and/or authorizing unauthorized or unnecessary CPI policies;

(5)     issuing statements to Plaintiff and the members of the Class that included fraudulent charges relating to the force placed CPI policies;

(6)     collecting payments from Plaintiff and members of the Class for premiums, interest, costs, and other fees related to wrongfully force-placed CPI policies;

(7)    transmitting payments for wrongfully imposed force-placed CPI Policies to National General Insurance;

(8)    accepting payment and/or commissions from National General Insurance for wrongfully force-placed CPI policies; and

(9)    threatening to repossess, and repossessing automobiles for nonpayment of wrongfully force-placed CPI policy premiums or interest thereon.

70.    National General Insurance participated in the operation and management of, the CPI Enterprise, both directly and indirectly, through the following acts:

(1)    accepting loan applications and other documentation related to automobile loans for the purpose of wrongfully issuing force-placed CPI policies from Wells Fargo;

(2)    reviewing loan applications and other documentation related to automobile loans for the purpose of wrongfully issuing force-placed CPI policies;

(3)    transmitting information regarding force-placed CPI policies to Wells Fargo with the intent that that information would be forwarded to Plaintiff and members of the Class;

(4)    authorizing the issuance of wrongfully force-placed CPI policies;

(5)    paying commissions to Wells Fargo for the forced-placement of CPI policies;

(6)    accepting payment from Wells Fargo for the wrongful forced-placement of CPI Policies; and

(7)    concealing the true nature of its acts and its relationship with Wells Fargo from Plaintiff and the members of the Class.

71.    In addition to the allegations above, Plaintiff asserts that Defendants directed and controlled the CPI Enterprise and took steps to implement the CPI Scheme through meetings and communications that Plaintiff cannot fully know of at present.

### C.    The Pattern of Racketeering Activity

72.    As set forth above, the CPI Scheme was facilitated, carried out, and maintained through the use of the United States mail and wires.  Defendants' participation in the CPI Scheme constitutes racketeering activity within the meaning of 18 U.S.C. § 1961 (a) as acts of mail fraud pursuant to 18 U.S.C. § 1341 and acts of wire fraud pursuant to 18 U.S.C. § 1343.  Defendants racketeering activity within the meaning of 18 U.S.C. § 1961 (a) also included numerous violations of the Hobbs Act, 18 U.S.C. § 1951(b).

73.    Defendants violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by utilizing the mail and wires in furtherance of their scheme to defraud automobile loan customers, including Plaintiff and members of the Class.  The CPI Scheme, which ultimately harmed hundreds of thousands of automobile loan customers, involved thousands of separate instances of use of the United States mail and/or wire communications in order to further the scheme.  These uses of the United States mail and/or wire communications include, but are not limited to:

(1)    the transmission of automobile loan applications by mail and wire;

(2)    the transmission of information on automobile loan customers between Wells Fargo and National General Insurance by mail and wire;

(3)    the transmission of information regarding CPI policies between Wells Fargo and National General Insurance by mail and wire;

(4)    the transmission of automobile loan account statements between Wells Fargo and customers by mail or wire;

(5)    the transmission of information regarding insurance held by automobile loan customers between Wells Fargo and National General Insurance by mail and wire;

(6)    the transmission of statements regarding late fees, delinquencies, demands for payment, collections actions, and/or threats to repossess vehicles between Wells Fargo and automobile loan customers by mail or wire;

(7)    the payment of commissions to Wells Fargo by National General Insurance in relation to the placement of CPI policies by mail or wire; and

(8)    communications between Wells Fargo and National General Insurance regarding or relating to the conduct and furtherance of the CPI Enterprise by mail and wire.

74.    The mail and wire transmissions described above were made in furtherance of the CPI Scheme.  Defendants carried out a pattern of related and continuous predicate acts in support of the CPI Scheme over the course of several years, beginning no later than 2012 and possibly well before.

75.    Defendants knew and intended that Plaintiff and members of the Class would rely on misrepresentations and omissions made by Defendants regarding the force-placed CPI Policies.  Defendants knew and intended that reliance on such misrepresentations and omissions would be detrimental to the interests of Plaintiff and the members of the Class.  Such reliance was essential to the success of the CPI Scheme.

76.    Defendants also violated 18 U.S.C. § 1951(b) by extorting money from consumers through the wrongful use of threats of economic harm and fear.  Specifically, Defendants obtained consumers' money in the form of premiums, interest, and related fees for the unwanted and unneeded forced place CPI policies, by wrongful use of actual and threatened repossession of consumers' vehicles, when Defendants had no lawful right to repossess those vehicles for non-payment of CPI premiums, interest, and other costs and fees that were not actually owed by the consumers.  Defendants carried out a pattern of related and continuous predicate acts over the course of several years, beginning no later than 2012 and possibly well before.

77.    Defendants undertook the practices and acts alleged herein as part of a common scheme and conspiracy to defraud Plaintiff and members of the Class. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c) as described herein. Other persons, firms, entities, and corporations not named as defendants in this action participated as co-conspirators with Defendants and performed acts in furtherance of the CPI Scheme and in support of the CPI Enterprise.  Defendants, in furtherance of the CPI Scheme and in support of the CPI Enterprise, aided and abetted those unnamed persons, firms, entities, and corporations.

**D.      Plaintiff and Members of the Class were Damaged by the CPI Enterprise**

78.      By reason of Defendants' conduct and their pattern of racketeering activity, Plaintiff and members of the Class have been injured in their business and/or property in numerous ways, including in their payment for unnecessary and wrongfully force-placed CPI policies, and interest, fees and costs relating to those policies, as well as the costs incurred as a result of lower credit scores and damaged credit reports.

79.      Defendants' violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d) have directly and proximately caused injury to Plaintiff and members of the Class.  Plaintiff and members of the Class are entitled to treble damages, as well as injunctive and/or equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**

**Violation of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200, et seq.**

80.      Plaintiff incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

81.      Plaintiff, on behalf of himself and the members of the Class, brings a claim pursuant to Cal. Bus. & Prof. Code § 17200 arising from Defendants' wrongful imposition of CPI policies by which Plaintiff and members of the Class were charged for CPI policies that they did not need.  In addition, as a result of Defendants' wrongful imposition of CPI policies, Plaintiff and members of the Class were charged fees and/or interest in connection with the CPI policies.

82.      Defendants were required to comply with the requirements of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, when conducting business with Plaintiff and the members of the Class.

83.      Because the wrongful conduct complained of herein occurred in California, UCL claims reach all members of the Class, including members of the Class who are not citizens of California.

84.     Wells Fargo's operations in California were the locus of decisions to enter into agreements with National General Insurance for the forced-placement of CPI policies on consumers who financed their automobile purchases through Wells Fargo, without regard to whether those consumers needed the CPI policies or not. Principal decision makers at Wells Fargo, including those involved in the decisions to enter into agreements with National General Insurance for the forced-placement of CPI policies on consumers who financed their automobile purchases through Wells Fargo are located in California.

85.     Pursuant to the UCL, Defendants are prohibited from engaging in "unlawful" business acts or practices.  As set forth in detail above, Defendants have engaged in unlawful acts or practices by violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, as well as laws prohibiting mail and wire fraud, and extortion.

86.     Plaintiff reserves the right to allege other violations of law that constitute unlawful business acts and/or practices.

87.     The UCL prohibits "unfair" business acts or practices.  As set forth in detail above, Defendants engaged in unfair acts or practices by, *inter alia*, (1) wrongfully imposing CPI policies on Wells Fargo customers who already had sufficient automobile insurance policies in place; (2) charging Wells Fargo customers premiums for these wrongfully imposed CPI policies; (3) including within those premium charges commissions that were paid to Defendants and/or benefitting from those premiums wrongfully charged to Plaintiff and the members of the Class; (4) imposing additional charges on Plaintiff and members of the Class arising from the wrongful imposition of CPI policies including, but not limited to, overdraft fees, fees for non-payment of automobile loans, fees relating to the reinstitution of delinquent loans, and fees relating to repossession of automobiles.

88.     Defendants systematically engaged in these unfair and unlawful business practices to the substantial detriment of Plaintiff and the members of the Class.

89.     The harm caused to Plaintiff and members of the Class by these business practices outweighs any legitimate business purpose they could have had.

90.     The legitimate business interests of the Defendants could have been addressed through reasonably available alternatives to the wrongful conduct described above.

91.     Defendants' practices as described above are immoral, unethical, and oppressive.

92.     Plaintiffs and other members of the Class have been harmed and have suffered monetary losses as a result of Defendants' violation of the UCL.   Thus, Plaintiff and the members of the Class are entitled to restitution in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (Fraud)

93.     Plaintiff incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

94.     Plaintiff brings this Count on behalf of himself and the members of the Class against Defendants.

95.     Defendants concealed and suppressed the wrongful placement of CPI policies on Plaintiffs. Plaintiffs were not obligated or required to maintain or pay for CPI policies, nor were Plaintiffs obligated or required to pay fees and costs associated with the CPI policies at issue. In fact, Defendants had no rightful basis to impose CPI policies or to collect the premiums and additional fees and costs associated with those policies.

96.     Plaintiff and members of the Class relied on Defendants' representations that the imposition of CPI polices was lawful and necessary, and paid premiums, interest, and other fees and costs as a result.

97.     Defendants knowingly imposed unnecessary CPI policies and omitted, concealed, and suppressed material facts relating to those policies.

98.     Defendants' fraudulent conduct injured Plaintiff and members of the Class, each of whom suffered a loss of money and/or property as a result of the wrongful imposition of CPI policies and the premiums, fees, and costs associated with those CPI policies.

99.     Defendants' omission, concealment, and suppression of material facts relating to the wrongful imposition of CPI policies was knowing and intentional.

100.    Plaintiff and the members of the Class justifiably relied on Defendants' knowing omission, concealment, and suppression of material facts. Defendants' concealment of material information regarding the CPI policies was intended to induce Plaintiff and member of the Class to believe that Defendants were entitled to monies that Defendants were not, in fact, entitled to. In many instances, payments relating to the wrongfully imposed CPI policies were deducted from the accounts of members of the Class without their knowledge.

101.    Defendants acted with malice, oppression, or fraud.

102.    As a direct and proximate result of Defendants' conduct and omission, concealment, and suppression of material facts, Plaintiff and the members of the Class have been damaged in an amount according to proof at trial.

**FOURTH CAUSE OF ACTION**

**(Unjust Enrichment)**

103.    Plaintiff incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

104.    Plaintiff brings this Count on behalf of himself and the members of the Class against Defendants.

105.    Through their wrongful imposition of CPI policies and the wrongful charges, fees and additional costs arising therefrom, and by the omission of material facts related to the CPI policies, Defendants were unjustly enriched at the expense of Plaintiff and the Class, and money belonging to Plaintiff and the Class was wrongfully and unjustly taken by Defendants.

106.    Defendants' retention of the profits obtained through their fraudulent, deceptive, and misleading conduct, as alleged herein, would be inequitable and unconscionable.

107.    Plaintiff and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

**FIFTH CAUSE OF ACTION**

**(Conversion)**

108.    Plaintiff incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

109.    Plaintiff and the members of the Class own and have the right to possess the money that is in their checking, savings, and other accounts.

110.    Defendant Wells Fargo wrongfully took money directly from the accounts of Plaintiff and members of the Class to cover fees, costs and other penalties relating to wrongfully imposed CPI policies, thereby gaining possession of this money.

111.    Plaintiff and members of the Class members did not consent to the wrongful imposition of CPI policies and thus did not consent to Wells Fargo taking money directly from their accounts to cover fees, costs and other penalties relating to the wrongfully imposed CPI policies.

112.    The wrongful taking of fees, costs, and other penalties by Wells Fargo from the accounts of Plaintiff and members of the Class damaged Plaintiff and members of the class in an amount that is capable of identification through Wells Fargo's records.


**SIXTH CAUSE OF ACTION**

**(Declaratory Relief)**

113.    Plaintiff incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

114.    Plaintiff brings this cause of action on behalf of himself and the members of the Class.

115.    As described herein, the Court has jurisdiction over this matter, and may therefore declare the rights of Plaintiff and the members of the Class.

116.    Plaintiff and the members of the Class seek an order declaring that Defendants' practice of imposing unauthorized and unnecessary CPI policies on Wells Fargo automobile loan customers is unlawful, that Wells Fargo's practice of failing to disclose such CPI policies

1   is unlawful, and that Defendants are liable to Plaintiff and members of the Class for damages

2   caused by those practices.

3

4                                     **REQUEST FOR RELIEF**

5         Plaintiff, on behalf of himself and the members of the Class, prays for relief as follows:

6         a.       An Order certifying this action as a class action, appointing Plaintiff to represent

7   the proposed Class pursuant to Fed. R. Civ. P. 23(a) and designating his counsel as Class

8   Counsel;

9         b.       An order enjoining Defendants from any further violations of the UCL as alleged

10   herein;

11         c.       A Declaration that Defendants' actions, as alleged herein, were and are unlawful;

12         d.       An Order awarding restitution and/or disgorgement of the profits derived by

13   Defendants as a results of their unfair, unlawful, and fraudulent practices as alleged herein;

14         e.       An Order awarding compensatory, statutory, and other damages sustained by

15   Plaintiff and the members of the Class;

16         f.       An Order awarding Plaintiff and members of the Class any applicable civil

17   penalties;

18         g.       An Order trebling the award of damages to Plaintiff and  members of the Class

19   pursuant to the Racketeer Influenced Corrupt Organizations Act;

20         h.       An Order awarding pre-judgment and post-judgment interest on any damages

21   awarded to Plaintiff and the members of the Class;

22         i.       An Order awarding Plaintiff's attorneys' fees, expert witness fees, and other

23   costs;

24         j.       Such other relief as deemed proper by the Court.

25

26   / / /

27   / / /

28   / / /

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury as to all matters so triable.

DATED:  September 1, 2017                Respectfully submitted,

ALTSHULER BERZON LLP


_____/s/ EVE H. CERVANTEZ_____
EVE H. CERVANTEZ (164709)

ecervantez@altber.com
JAMES M. FINBERG (114850)
jfinberg@altber.com
177 Post Street Suite 200
San Francisco, CA  94108
Telephone:  (415) 421-7151
Facsimile: (415) 362-8064

BARRACK, RODOS & BACINE
STEPHEN R. BASSER (121590)
sbasser@barrack.com
SAMUEL M. WARD (216562)
sward@barrack.com
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:  (619) 230-0800

EMERSON SCOTT, LLP
JOHN G. EMERSON*
jemerson@emersonfirm.com
830 Apollo Lane
Houston, TX  77058
Telephone:  (281) 488-8854
Facsimile:  (281) 488-8867

*Attorneys for Plaintiff*

*(\*pro hac application to be submitted)*

28 - CLASS ACTION COMPLAINT